| | |
|---|---|
| **CITY OF NEW YORK,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action 11-1169 (RC)** |
| **NATIONAL RAILROAD PASSENGER CORPORATION,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

The City of New York brought this suit to seek a declaratory judgment that the National Railroad Passenger Corporation—better known as Amtrak—is liable for the rehabilitation of a bridge that crosses train tracks in the Bronx. The parties have filed cross-motions for summary judgment.

The City claims that an agreement contained in a 1906 deed, which transferred title to the land supporting the bridge from the City to a predecessor of Amtrak, now obligates Amtrak to maintain the bridge in perpetuity. The parties disagree about whether this agreement was an affirmative covenant running with the land or merely a contract. But however the agreement is characterized, it did not pass to Amtrak in the national rail reorganization that brought that railroad into being. Nor is Amtrak responsible for maintaining the bridge in the absence of any agreement. The court will therefore grant summary judgment to Amtrak on the issue of liability for bridge rehabilitation.

In the alternative, the City argues that Amtrak must at least cover the cost of removing the railroad's electrical equipment from the underside of the bridge, so that the City could proceed with the rehabilitation. The City paid Amtrak to perform that work, and now seeks to

recoup those payments under two related theories of restitution: emergency assistance and indemnification. The court will grant summary judgment to Amtrak on these claims, as well, because no reasonable jury could find that the removal of Amtrak's electrical equipment was immediately necessary to protect the public safety, and indemnification does not fit the facts of this case.

## I. BACKGROUND

This case concerns the rehabilitation of a bridge that carries a public road over train tracks in the Bronx. The road was in use by 1849, running across land owned by the family of Robert Bartow. By 1900, a railroad crossed it at grade level. As the result of several condemnations and acquisitions, the Harlem River and Port Chester Railroad Company (the "railroad company") owned those tracks and the land supporting them, along with a train station, while the City of New York owned the road on both sides of the tracks and other adjacent land. In 1906, the City conveyed some of its land to the railroad company "upon the express condition that the said Railroad Company, its successors, lessees and assigns . . . perform" a number of "covenants and conditions," including the following:

> SECOND. The said railroad company shall at its own expense construct a bridge with the necessary abutments and approaches thereto, over the property of the railroad company, east of Bartow Station, the width of such bridge and approaches to be eighty feet.

> SEVENTH. The said railroad company shall maintain and keep in repair at its own expense the bridges and abutments hereinbefore agreed to be constructed by it, except the pavement of such bridges.

> FIFTEENTH. The said railroad company shall cause permanent rights of way or easements across its property . . . at Bartow Station crossing of a width of eighty (80) feet . . . to be conveyed by proper instruments in writing to the City of New York within ninety (90) days after the execution of this agreement.

Declaration of Daniel G. Jarcho (Feb. 28, 2012) ("Jarcho Decl."), Ex. 10 (Deed from the City of New York to the Harlem River and Port Chester Railroad Company (June 30, 1906)) ("1906

Deed"), at 12–15.  (A large part of this litigation concerns the present effect of the seventh

paragraph, which the court will refer to as the "Maintenance and Repair Agreement.")  If the

railroad company did not "fulfill each and every" of these "conditions and covenants," the lands

conveyed would "be forfeited and . . . revert to the City of New York."  *Id.* at 15.

 After building the bridge in question here—which the parties call the Shore Road Circle

Bridge—the railroad company "grant[ed] and convey[ed] to the CITY OF NEW YORK, a

permanent right of way or easement across its property at Bartow Station . . . of a width of eighty

(80) feet . . . which said right[ ] of way or easement[ ]" was "limited for the purpose of the

continued existence of a bridge carrying the public highway . . . across the railroad tracks of said

company."  Jarcho Decl., Ex. 13 (Easement from Harlem River and Port Chester Railroad

Company to the City of New York (Aug. 19, 1909)), at 1.  The easement accommodated a bridge

"at such an elevation as to provide a clear headroom of eighteen (18) feet above the present

elevation of the top of the rails of the railroad tracks."  *Id.*  It was "conveyed . . . in compliance

with the terms of" the "written contract" containing the Maintenance and Repair Agreement.  *Id.*

at 2–3.

 In 1927, the Harlem River and Port Chester Railroad Company merged into the New

York, New Haven and Hartford Railroad, which declared bankruptcy and had its assets sold to

the Penn Central Transportation Company in 1968.  As the D.C. Circuit has explained:

> By 1971, Penn Central had filed for bankruptcy.  It was not alone.  By the early
> 1970s, the railroads in the northeast were failing at such a rapid rate that Congress
> stepped in to resolve the regional rail crisis.  Congress passed the Regional Rail
> Reorganization Act of 1973, Pub. L. No. 93-236, 87 Stat. 985 (1974) (codified as
> amended at 45 U.S.C. § 701 *et seq.* (1994)) (the "Rail Act"), which allowed the
> railroads to reorganize into a single entity, and [the Consolidated Rail Corporation,
> better known as] Conrail was designed to salvage the viable rail properties, leaving
> much of the debt behind in bankruptcy and beginning with a "clean slate." . . .

> The Rail Act created the United States Railway Association, *see* 45 U.S.C. § 711(a),
> a non-profit corporation, which in turn prepared a Final System Plan. . . which

> designated how rail properties held by the bankrupt railroads would be distributed, *see* 45 U.S.C. § 716. The Rail Act also created Conrail, *see* 45 U.S.C. § 741(a), and mandated that rail properties designated in the Final System Plan be conveyed to Conrail, *see* 45 U.S.C. § 743(b).

*City of Philadelphia v. Consol. Rail Corp.*, 222 F.3d 990, 991–92 (D.C. Cir. 2000) (abbreviation expanded). Those properties "were to be 'conveyed . . . free and clear of any liens or encumbrances.'" *Consol. Rail Corp. v. Ray ex rel. Boyd*, 632 F.3d 1279, 1281 (D.C. Cir. 2011) (quoting 45 U.S.C. § 743(b)(2)) (emphasis omitted).

The Rail Act created a Special Court to order the conveyance and "resolve disputes related to the reorganization." *Id.* at 1280.[1] The Special Court issued a conveyance order, *see City of Philadelphia*, 222 F.3d at 992 (citing 45 U.S.C. § 719(b)), pursuant to which the Penn Central bankruptcy trustees deeded to Conrail all the Bronx real property associated with the railroad lines running under the Shore Road Circle Bridge, subject to "all existing. . . easements," Jarcho Decl., Ex. 15 (Deed from Penn Central Trustees to Conrail (Mar. 30, 1976)), at 3. The trustees also executed a bill of sale and assignment, which transferred to Conrail all of Penn Central's "right, title and interest in" the "[e]xecutory [c]ontracts and [a]greements" described in Schedule E to that bill of sale. *Id.*, Ex. 16 (Bill of Sale and Agreement Between Penn Central Trustees and Conrail (Mar. 30, 1976)) ("Bill of Sale"), at 2. Schedule E, in turn, included all of the "rights . . . in, under and to each and every contract" of Penn Central's "which is used or useful in the provision of rail services," except for those explicitly excluded. *Id.* at E1; *see also Erie Dock Co. v. Erie Lackawanna, Inc.*, 688 F.Supp. 1556, 1557 (Reg'l Rail Reorg. Ct. 1988) ("Under Schedule E, Conrail assumed all executory contracts that were 'used or useful in the provision of rail services'—with certain exceptions."). Among the excluded contracts were

---

[1] That court was abolished in 1997, and its jurisdiction transferred to this court. *See* 45 U.S.C. § 719(b)(2).

all "construction agreements," "demolition agreements" and "agreements for rehabilitation or modernization of rail properties" that would require Conrail "to complete said construction . . . . demolition . . . . [or] rehabilitation or modernization subsequent to conveyance date, without complete financial remuneration." Bill of Sale at E2. Shortly thereafter, Conrail conveyed to Amtrak the real property supporting the Shore Road Circle Bridge—also subject to "all existing . . . easements," Jarcho Decl., Ex. 17 (Deed from Conrail to Amtrak (Apr. 1, 1976)), at 6—and executed a bill of sale and assignment transferring, with exceptions not relevant here, all contractual rights "associated with th[at] real property," *id.*, Ex. 18 (Bill of Sale and Agreement Between Conrail and Amtrak (Apr. 1, 1976)), at Schedule E, page 17.

In 1997, the City of New York hired an engineering firm to begin preparing to rehabilitate the Shore Road Circle Bridge. In 2003, Amtrak and the City signed an agreement under which Amtrak would "make necessary changes in its railroad facilities" so that the bridge project could proceed. Jarcho Decl., Ex. 41 (Contract between Amtrak and the City of New York (Dec. 22, 2003)), at 3. Those necessary changes included the removal of structures attached to the underside of the bridge, which provided electricity to Amtrak's trains and insulated the bridge from that electrical current. In 2004 and 2005, pursuant to the agreement, Amtrak built poles to which its electrical equipment could be attached; the equipment was removed from the bridge and attached to the poles several years later. Decl. of John S. Ramo (Feb., 27, 2012), at ¶ 9. In 2007, the City awarded a contract for the replacement of the bridge.

In 2010, the City brought this suit in the Southern District of New York, alleging that Amtrak was liable under the 1906 Deed for the cost of the bridge rehabilitation. Amtrak's primary defense was that the deeds and bills of sale that transferred the real property supporting the bridge and the contracts associated with it did not convey that liability to Amtrak. Because the resolution of that dispute would require the interpretation of the conveyance orders issued

pursuant to the Rail Act, the district court found that the Act gave this court—sitting as the Special Court—exclusive jurisdiction over the case, and accordingly transferred it here. Order (June 13, 2011), at 6. The parties have filed cross-motions for summary judgment. The bridge rehabilitation project was ongoing when those motions became ripe.

## II.  LEGAL STANDARD

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. *Id.* at 323; FED. R. CIV. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials"). In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine dispute that is suitable for trial. *Celotex*, 477 U.S. at 324.

On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered

without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## III.  ANALYSIS

### A.  Liability for Bridge Replacement

The City of New York seeks to hold Amtrak liable for the cost of replacing the Shore Road Circle Bridge.  The City's primary argument is that the Maintenance and Repair Agreement included in the 1906 Deed is an affirmative covenant that runs with the land, and that it obligates Amtrak to "maintain and keep [the bridge] in repair at its own expense."  1906 Deed at 13.  Amtrak, in turn, argues that the agreement was simply a contract that was not transferred in the rail reorganization.  The court need not resolve that dispute, because whether the agreement was a contract or an affirmative covenant, it does not presently obligate Amtrak.

#### i.  Contract

As a general matter, "the [railroad] bankruptcies and the [Regional Rail] Reorganization Act" "absolved [Amtrak] of contractual liability" arising from agreements made by its predecessors. *City of Philadelphia*, 222 F.3d at 994.  Amtrak only assumed the contracts that Conrail expressly assigned to it, and Conrail only received from Penn Central contracts that were "used or useful in the provision of rail services"—and not all of those.  Bill of Sale at E1; *see also Erie Dock Co.*, 688 F.Supp. at 1557.  Even useful contracts were not assigned to Conrail if they were "construction agreements," "demolition agreements" or "agreements for rehabilitation or modernization of rail properties" that would require Conrail "to complete said construction . . . . demolition . . . . [or] rehabilitation or modernization subsequent to [the] conveyance date, without complete financial remuneration."  Bill of Sale at E2.  Amtrak argues that the Maintenance and Repair Agreement was a contract that was not assigned to Conrail, because it

was not "used or useful in the provision of rail services" or else required performance "subsequent to [the] conveyance date, without complete financial remuneration."

The City of New York argues vigorously that the agreement is not a contract—or not exclusively a contract—but rather, at least in part, an affirmative covenant running with the land. The City is so certain that the agreement is a running covenant that it does not take the trouble to deny that if the agreement is a only contract then Amtrak did not assume it. The City has conceded that point, and so the court proceeds to consider what follows from the assumption that the Maintenance and Repair Agreement is indeed a running covenant.

### ii. Covenant

The land that Amtrak received in the rail reorganization was, as the Rail Act required, "conveyed free and clear of any liens or encumbrances." 45 U.S.C. § 743(b)(2). In this circuit, that phrase is interpreted in light of the Supreme Court's reading of the Foreign Sovereign Immunities Act. The Court has explained that:

> At the time of FSIA's adoption in 1976, a "lien" was defined as "[a] charge or security or incumbrance upon property." BLACK'S LAW DICTIONARY 1072 (4th ed. 1951). "Incumbrance," in turn, was defined as "[a]ny right to, or interest in, land which may subsist in another to the diminution of its value. . . ." *Id.*[ ] at 908.

*Ray*, 632 F.3d at 1281 (quoting *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007)) (alterations in *Ray*). "Because the Rail Act was passed just three years before the FSIA," the D.C. Circuit "see[s] no reason to believe 'liens or encumbrances' should be understood any differently" when used in the Rail Act than when those terms appear in the Foreign Sovereign Immunities Act. *Id.*

Amtrak argues that any affirmative covenant to repair and maintain the Shore Road Circle Bridge was a "lien or encumbrance" within the meaning of the Rail Act, because such a

covenant would necessarily diminish the value of the land that was subject to it.[2]  The City does

not precisely disagree.  Instead the City argues that Congress was legislating pursuant to its

bankruptcy power when it passed the Rail Act and that, because restrictions of record running

with the land are generally not extinguished in bankruptcy, the court should conclude that the

Maintenance and Repair Agreement survived the conveyance "free and clear of any liens or

encumbrances."  45 U.S.C. § 743(b)(2).

One district judge has accepted this argument.  In *City of New York v. National Railroad
Passenger Corporation*, as here, the City sought to recover for the cost of relocating Amtrak's

electrical equipment from a bridge.  2008 WL 5169636 (E.D.N.Y. Dec. 09, 2008).  The City

argued that it held an easement allowing it to maintain the bridge, and that Amtrak's electrical

equipment had impermissibly interfered with that easement.  Amtrak, in turn, argued that the

easement had been extinguished by the Rail Act.  The district court "analogize[d] to the

principles of bankruptcy law to interpret the intentions of Congress" in passing the Rail Act.  *Id.*

at *8.  Because "the Bankruptcy Code does not," in most cases, "allow the Bankruptcy Court to

authorize a sale . . . 'free and clear' of an easement," the court concluded that "the easement" at

issue there "survived the Rail Act."  *Id.*

---

[2]   Amtrak also notes that affirmative covenants are commonly considered to be
encumbrances.  *See, e.g.*, *Boyle v. Lake Forest Prop. Owners Ass'n, Inc.*, 538 F. Supp. 765, 769
(S.D. Ala. 1982) (stating that "an affirmative covenant running with the land" is an
"encumbrance"); *Magraw v. Dillow*, 671 A.2d 485, 490 (Md. 1996) ("The word [encumbrance]
has no precise meaning but includes . . . covenants running with the land at the time of
conveyance . . . .") (brackets in original) (internal quotation marks omitted); *O'Neill v. Van
Tassel*, 33 N.E. 314, 315 (N.Y. 1893) (holding that "a covenant running with the land, which
compels the owner to rebuild and repair" a wall in the same manner "as when originally
constructed . . . . cannot be regarded in any other light than as a perpetual incumbrance"); *Blain
v. Taylor*, 19 Abb. Pr. 228 (N.Y. Sup. Ct. 1864) (holding that covenant to maintain and repair
fences "runs with the land, and is an encumbrance").

The *Ray* court explicitly rejected this reasoning. In *Ray*, Conrail argued that the D.C. Circuit should interpret 45 U.S.C. § 743(b)(2), which contains the Rail Act's requirement that land be "conveyed free and clear of any liens or encumbrances," in light of "§ 363 of the Bankruptcy Code, which authorizes a bankruptcy trustee to sell a debtor's asset 'free and clear of any interest in such property.'" *Ray*, 632 F.3d at 1282 (quoting 11 U.S.C. § 363(f)). The Circuit explained that, "because § 743(b)(2) of the Rail Act uses different terms than does § 363(f) of the Bankruptcy Code, an interpretation of the latter statute does not inform our reading of the former." *Id.* The City's attempts to limit *Ray* to its facts are unavailing: in this circuit, *Ray* controls the interpretation of § 743(b)(2) and prohibits a district court from interpreting the conveyance of land "free and clear of any liens or encumbrances" under the Rail Act by reference to the Bankruptcy Code's authorization of asset sales "free and clear of any interest in such property."

An affirmative covenant requiring bridge maintenance is clearly an encumbrance as that term is defined by *Ray*, because it is a "right to, or interest in, land which may subsist in another to the diminution of [the land's] value." *Id.* at 1281 (internal quotation marks omitted). If Amtrak were bound by such a covenant, that covenant would give the City the right to have the bridge maintained at no cost to itself. The burden of that maintenance obligation would diminish the value of the land with which it ran. Such a covenant would therefore be an encumbrance within the meaning of 45 U.S.C. § 743(b)(2), and the land that it would otherwise have burdened would necessarily have been conveyed "free and clear" of the covenant.

The City seems to make a related but subtly different argument: that Congress enacted the Rail Act pursuant to its bankruptcy power, and that the bankruptcy power does not extend to the extinguishment of affirmative covenants running with the land. The first half of that proposition provides less than the whole story: both the Supreme Court and the Special Court

10

have described the Rail Act as drawing on both Congress's bankruptcy power and the eminent domain authority derived from its commerce power. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 151, 153 (1974) (rejecting argument that "the Rail Act w[as] merely an eminent domain statute" and explaining that Congress also "intended to legislate pursuant to the bankruptcy power"); *Norwich & Worcester R.R. Co. v. United States*, 408 F. Supp. 1398, 1404 (Reg'l Rail Reorg. Ct. 1976) (Friendly, J.) (explaining that the Rail Act "drew both on the bankruptcy power and on the authority of Congress to exercise eminent domain under the commerce power," and that "this latter authority . . . was the basis for holding that any inadequacies in the compensation afforded under [the Rail Act] could be recovered in an action in the Court of Claims under the Tucker Act"). The second half of the City's argument is essentially an assertion that, as the *Ray* court has interpreted it, § 743(b)(2) is unconstitutional. But the City does not point to any authority for its premise that the Constitution forbids the extinguishment of affirmative covenants in bankruptcy, instead citing the Bankruptcy Code as though that law defined the scope of the constitutional bankruptcy power—and offering no reason to conclude that it does.

In sum, the parties agree that the Maintenance and Repair Agreement is either a contract or an affirmative covenant—or, perhaps, a hybrid of the two. If it is a contract, that contract was (as the City concedes) not "used or useful in the provision of rail services" or else required performance "subsequent to [the] conveyance date without complete financial remuneration" and so did not pass to Amtrak. *See* Bill of Sale at E1–E2. If, on the other hand, the agreement is an affirmative covenant, then it is an encumbrance within the meaning of § 743(b)(2) of the Rail Act because it gives another party rights in the land that is subject to the covenant, and thereby diminishes its value. The land with which any affirmative covenant formerly ran was therefore

conveyed to Amtrak "free and clear" of that covenant. In either case, the Maintenance and Repair Agreement does not presently obligate Amtrak to replace the Shore Road Circle Bridge.

### iii. Ownership

The City offers another theory of Amtrak's liability: that Amtrak owns the bridge and is therefore obligated to maintain it, independent of any contract or covenant. This argument is hard to square with the heavy emphasis that the City places on the Maintenance and Repair Agreement. If the City does not own the bridge and never has, and ownership carries with it the obligation of maintenance and repair, then what purpose did the Maintenance and Repair Agreement ever serve? There is no good answer to that question, which suggests that the original parties believed that, in the absence of an agreement, the City would bear the burden of bridge maintenance and repair.

If that is what the parties believed, they were right. Under New York law, "[t]he grantee of an easement to use a bridge is bound to keep it in repair," *Schenectady Ry. v. Greene*, 227 A.D. 11, 15 (3d Dep't 1929), *aff'd*, 257 N.Y. 610 (1931), because "the duty to maintain and repair structures or facilities existing under an easement rests on the dominant, not the servient, owner," *Sutera v. Go Jokir, Inc.*, 86 F.3d 298, 302 (2d Cir. 1996) (applying N.Y. law). "This rule is invoked in disputes between servient and dominant owners to decide which party is required to make repairs." *Id.* Because the easement in question here benefits the City of New York and burdens Amtrak's land, the City is the dominant owner and, absent any effectual agreement to the contrary, must repair the bridge that supports its easement.

In the early twentieth century, a New York court reached that conclusion in circumstances quite similar to those presented here. An earlier case had addressed the question of whether a railroad owed taxes on highway bridges that it had built; that answer depended on whether the bridges were its property. *See People ex rel. N.Y. Cent. & Hudson River R.R. Co. v.*

*Purdy*, 149 N.Y.S. 315 (N.Y. Sup. Ct. 1914). In *Purdy*, the City of New York owned the fee of the land over which bridges carried the public highway, and the railroad held an easement allowing train tracks to run beneath those bridges. *Id.* at 317. The railroad company had paid most of the bridge construction costs. *Id.* at 316–17. The *Purdy* court noted that, as a general matter, "structures. . . erected by persons not the owners of the land . . . become part of the realty, and as such the property of the landowner" but not if "the fee is subject to certain easements, and the structures. . . are appurtenant to said easements and not to the fee." *Id.* at 317. Ownership of the bridges, therefore, depended on "whether or not the bridges are appurtenant to the easement of the railroad." *Id.* The fact that the railroad company had paid most of the bridge construction costs was "not sufficient to give it title to the bridges." *Id.* at 318.

In analyzing the question of appurtenance, the *Purdy* court emphasized that the railroad had not made any use of the bridges, except to attach railroad signals to them. *Id.*; *see also id.* ("Were [the bridges] removed by the city, the operation of the railroad would in no way be impaired."). By contrast, the bridges "form[ed] an essential part of the [City's] street system, and were evidently constructed to give effect to the purpose for which" the City acquired the land supporting the bridges from the railroad company, *id.*, that is, to allow the highway to cross the train tracks. The court therefore concluded that the City owned the bridges, because they were not appurtenant to the railroad's easement. *Id.* at 319.

*Ward v. Erie Railroad Company*, which was decided several months after *Purdy*, presented the same question as this case: whether a city or a railroad company was liable for the repair of a bridge that carried a public highway over a railroad. The bridge was built pursuant to a statute intended to eliminate at-grade crossings.

> The statute contemplated that the general plan [for the elimination of such crossings] would involve the construction of overhead crossings to carry the railroad tracks in some instances, while in others the structure would be "used as a highway over the railroad tracks," and in the natural course of events the railroad corporation would be called upon to maintain the structure necessary to the operation of its road, while the municipality, under its general obligation to maintain the highways, would be called upon to stand the expense of those structures which were "used as a highway over the railroad tracks."

149 N.Y.S. 717, 725 (N.Y. Sup. Ct. 1914) (quoting statutory text). Relying on *Purdy*, the *Ward* court held that "where the structure was to be 'used as a highway over the railroad tracks,' where such structure became an 'essential part of the street system,' and where, if such structures were entirely removed, the operation of the railroad would be in no wise impaired, it would seem, in the absence of any contract whatever in respect to the maintenance, it would devolve upon the city . . . to care for such structures." *Id.* (second quotation from *Purdy*, 149 N.Y.S. at 318) (citations omitted).

That is precisely the situation here. Nonetheless, the City argues that the language of its easement, which was expressly preserved in the Rail Act conveyance,[3] proves that Amtrak owns the bridge, because the City could not have a right of way to cross a bridge that it owned. But the language of the easement clearly encompasses both the bridge structure and the right of way. The City received "a permanent right of way or easement . . . for the purpose of the continued existence of a bridge carrying the public highway . . . across the railroad tracks" owned by the original railroad company. Jarcho Decl., Ex. 13 (Easement from Harlem River and Port Chester Railroad Company to the City of New York (Aug. 19, 1909)), at 1. The physical description emphasized that the "easement or right of way" was "for the purpose of carrying a street or highway across the tracks . . . by means of a bridge or viaduct." *Id.* An easement "for the

---

[3] *See* Jarcho Decl., Ex. 15 (Deed from Penn Central Trustees to Conrail (Mar. 30, 1976)), at 3; *id.*, Ex. 17 (Deed from Conrail to Amtrak (Apr. 1, 1976)), at 6.

purpose of the continued existence of a bridge" or, alternatively, "for the purpose of carrying a street or highway across the tracks . . . by means of a bridge" plainly allows a party to maintain its bridge upon another's land. It does not, as the City argues, merely convey the right to cross the other's bridge.

For that reason, and in accordance with *Ward* and *Purdy*, the City of New York is responsible for the cost of rehabilitating the Shore Road Circle Bridge.

## B. Liability for Electrical Work

Although Amtrak is not liable for the entire cost of rehabilitating the bridge, the City argues that Amtrak is nonetheless responsible for the cost of removing its electrical equipment from the bridge to allow that work to proceed. The City invokes New York's public utility rule, under which "public service corporations maintain their rights in the streets, subject to reasonable regulation and control, and are bound to relocate their structures at their own expense whenever the public health, safety or convenience requires the change to be made." *Transit Comm'n v. Long Island R.R. Co.*, 253 N.Y. 345, 351 (N.Y. 1930). The City argues that when Amtrak attached its electrical facilities to the Shore Road Circle Bridge, it took "the risk of their location and is bound to make such changes as the public convenience and security require, at its own cost and charge," just as a gas or electric company must. *Id.* The City has already paid Amtrak to remove the electrical equipment, but now seeks to recover those funds under two different theories of restitution.[4]

---

[4] The City also asserts that it may have a right to restitution for the cost of work unrelated to the removal of electrical equipment, but it has not explained the basis of any such right, which would not seem to follow from the public utility rule. The court will therefore grant summary judgment to Amtrak on any claim for restitution over and above the cost of the removal of electrical equipment and associated material from the bridge.

### i. Preemption

Amtrak's first argument is that, even if it would ordinarily be liable to the City under the public utility rule, that rule was preempted by the Rail Passenger Service Act, which provides that any "State or other law related to rates, routes or service does not apply to Amtrak in connection with rail passenger transportation," 49 U.S.C. § 24301(g). Amtrak argues that New York's public utility rule is a state law related to its routes, because that rule would impose liability for work performed along its Northeast Corridor route. Amtrak reads "related to . . . routes" overbroadly, and ignores the limiting phrase "in connection with rail passenger transportation."

"Where, as in this case, Congress has superseded state [law] by statute, [a court's] task is to 'identify the domain expressly pre-empted.'" *Dan's City Used Cars, Inc. v. Pelkey*, 133 S.Ct. 1769, 1778 (2013) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)). "To do so, [a court must] focus first on the statutory language, 'which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Id.* (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Few courts have interpreted the preemption provision in the Rail Passenger Service Act, but that provision bears a striking similarity to the Federal Aviation Administration Authorization Act of 1994 ("FAAA"), *see* 49 U.S.C. § 14501(c)(1), which itself "borrowed language" from the Airline Deregulation Act ("ADA"), *Rowe v. N.H. Motor Transport Assoc.*, 552 U.S. 364, 370 (2008); *see* 49 U.S.C. § 41713(b)(1). The Supreme Court has weighed in on those analogues. *See Dan's City*, 133 S.Ct. at 1778–81; *Rowe*, 552 U.S. at 370–71; *Morales v. Trans World Airlines*, 504 U.S. 374, 384–90 (1992).

Like the Rail Passenger Service Act, the Airline Deregulation Act "prohibit[s] the States from enforcing any law 'relating to rates, routes, or services' of any air carrier," *Morales v. Trans World Airlines*, 504 U.S. at 378–79 (quoting 49 U.S.C. § 1305(a)(1) (Supp. IV 1992), now

16

codified at 49 U.S.C. § 41713(b)(1)).  The Federal Aviation Administration Authorization Act, in turn, prohibits the enactment or enforcement of any state "law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).  "[I]nformed by decisions interpreting parallel language in the ADA's preemption clause," the Supreme Court has said that the FAAA's use of "'related to' embraces state laws 'having a connection with or reference to' carrier '"rates, routes, or services," whether directly or indirectly.'"  *Dan's City*, 133 S.Ct. at 1778 (quoting *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 384)) (emphasis deleted in *Dan's City*).  "At the same time, the breadth of the words 'related to' does not mean the sky is the limit."  *Id.*  The Supreme Court has "refused to read the preemption clause of the Employee Retirement Income Security Act of 1974 [("ERISA")], 29 U.S.C. § 1144(a), which supercedes state laws 'relate[d] to any employee benefit plan,' with an 'uncritical literalism,' else 'for all practical purposes pre-emption would never run its course,'" *id.* (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* ("*Travelers*"), 514 U.S. 645, 655–56 (1995)) (alteration in original), because "'[r]eally, universally, relations stop nowhere,'" *Travelers*, 514 U.S. at 655 (quoting HENRY JAMES, RODERICK HUDSON xli (New York ed., World's Classics 1980)) (alteration in original); *accord Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997); *see also De Buono v. NYSA-ILA Medical and Clinical Services Fund*, 520 U.S. 806, 813 (1997) ("In *Travelers* . . . . we were quite clear . . . that the text could not be read to 'extend to the furthest stretch of its indeterminacy' . . . ." (quoting *Travelers*, 514 U.S. at 655)); *Dillingham Constr.*, 519 U.S. at 335 (Scalia, J., concurring) ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.").  Finally, the Supreme Court has "cautioned that [the FAAA] does not preempt state laws affecting carrier prices, routes, and services 'in only a

"tenuous, remote, or peripheral . . . manner."'" *Dan's City*, 133 S.Ct. at 1778 (quoting *Rowe*, 552 U.S. at 371 (quoting *Morales*, 504 U.S. at 390)).

The question here is whether a common law rule requiring Amtrak to remove electrical facilities attached to a public bridge is "related to . . . routes," and whether the City seeks to apply that rule "to Amtrak in connection with rail passenger transportation" within the meaning of the Rail Passenger Service Act. 49 U.S.C. § 24301(g). The Supreme Court has said that one thing is "related to" another if it affects (or has the potential to affect) the other thing in a way that is "significant" rather than "tenuous, remote, or peripheral." *See Rowe*, 552 U.S. at 370 (holding that "pre-emption may occur" when a state law indirectly affects routes); *Morales*, 504 U.S. at 389 (holding that "state restrictions on fare advertising" are pre-empted because they "have [a] significant effect upon fares"). The Ninth Circuit has held that "routes" are "courses of travel." *Air Transp. Ass'n of Am. v. City & County of San Francisco*, 266 F.3d 1064, 1071 (9th Cir. 2001) (interpreting the ADA). If that is right, then the question is whether the application of the public utility rule to Amtrak would affect the course of travel of its trains—and the answer is, obviously, no.

And even if the public utility rule were "related to . . . routes," that alone would not establish preemption. For purposes of preemption under the Rail Passenger Service Act, a state law must be *both* "related to rates, routes or service" *and* "appl[ied] to Amtrak in connection with rail passenger transportation." 49 U.S.C. § 24301(g); *cf. Dan's City*, 133 S.Ct. at 1778–79 ("[F]or purposes of FAAA preemption, it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.'"). Just as the phrase "'with respect to the transportation of property' . . . . 'massively limits the scope of preemption' ordered by the FAAA," *Dan's City*, 133 S.Ct. at 1778 (second quotation from *City of Columbus v. Ours Garage & Wrecker Serv.,*

18

*Inc.*, 536 U.S. 424, 449 (2002) (Scalia, J., dissenting)), so too does the phrase "in connection with rail passenger transportation" substantially limit the preemptive scope of the Rail Passenger Service Act. And the simple fact that Amtrak transports rail passengers beneath the Shore Road Circle Bridge is not enough to establish a connection between the public utility rule and rail passenger transportation.

One district court has applied a broader interpretation of 49 U.S.C. § 24301(g). In *National Railroad Passenger Corporation v. Caln Township*, 2010 WL 92518 (E.D. Pa. Jan. 8, 2010), the district court concluded that a local ordinance prohibiting weed growth above eight inches was "related to . . . routes" and therefore preempted because its enforcement would impose a cost on Amtrak and so consume resources that would otherwise be available to operate train routes, *id.* at 3, and because the enforcement of inconsistent municipal vegetation ordinances along Amtrak's routes would create a substantial compliance burden, *id.* at 4. (The court did not explain how the ordinance would "apply to Amtrak in connection with rail passenger transportation.") The first rationale is troublingly broad—*anything* that imposes a cost on Amtrak reduces the resources available to operate its routes, but it cannot be that all cost-imposing state laws are therefore "related to . . . routes"—and the second does not apply here. To enforce New York's public utility rule against Amtrak would not subject it to the risk of incompatible compliance regimes of the sort that worried the *Caln Township* court.

Application of the public utility rule would neither alter the course that Amtrak's trains travel nor subject the railroad company to the vagaries of varied local ordinances. The rule would impose a cost on Amtrak, but that is not enough to make a law "related to . . . routes," much less "appl[ied] to Amtrak in connection with rail passenger transportation"—and Amtrak could have avoided that cost by placing its electrical equipment on poles (where the equipment is currently located) rather than affixing that equipment to the underside of the City's bridge. The

court therefore concludes that the public utility rule was not preempted by the Rail Passenger

Service Act, 49 U.S.C. § 24301(g).

### ii. Waiver

Amtrak next argues that the City waived any claims under the public utility rule when it

signed the contract under which Amtrak removed the electrical facilities at the City's expense.

That contract read, in relevant part, as follows:

> The City agrees to reimburse [Amtrak] for the entire reasonable cost of any work performed . . . .
>
> The parties agree that the payments made or contract work performed pursuant to this agreement does not constitute release from liability, responsibility, or cost for site reconstruction, replacement, repair, improvement, maintenance or any work whatsoever. Each party shall retain its legal remedies to pursue reimbursement for work done pursuant to this agreement, and all statutory obligations, and in all related issues concerning responsibility for site reconstruction, replacement, repair, improvement, maintenance, or any other work whatsoever.

Jarcho Decl., Ex. 41 (Contract between Amtrak and the City of New York (Dec. 22, 2003)), at 3.

Amtrak argues that the City agreed "to reimburse [Amtrak] for the entire reasonable cost of any

work performed" and is bound to that promise. The City replies that it only did so with the

understanding that "payments made . . . pursuant to this agreement" would "not constitute

release from liability," and that it expressly reserved "its legal remedies to pursue reimbursement

for work done pursuant to this agreement."

The contract plainly supports the City's position, and "when parties set down their

agreement in a clear, complete document, their writing should be enforced according to its

terms." *NML Capital v. Rep. of Argentina*, 17 N.Y.3d 250, 259 (N.Y. 2011) (internal quotation

marks omitted). Amtrak argues that a second contract limited the City's right to recover, but the

City explains that none of the work at issue here was performed pursuant to that second contract.

Amtrak does not respond—and so concedes the point. Amtrak also points to the course of

conduct between the parties, arguing that negotiations over the total cost of the work that Amtrak would perform are evidence that the City expected to pay for it. But such extrinsic evidence is inadmissible where, as here, the written contract is unambiguous. *See, e.g.*, *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 33 (N.Y. 2002). The City explicitly reserved "its legal remedies to pursue reimbursement for work done pursuant to" the contract that Amtrak claims waived those remedies. It is therefore free to pursue them here.

### iii. Emergency Assistance

"New York has adopted the 'emergency assistance doctrine' set forth in § 115 of the Restatement (First) of Restitution." *Chase Manhattan Bank, N.A. v. T & N plc*, 905 F. Supp. 107, 122 (S.D.N.Y. 1995); *see also United States v. Consol. Edison Co. of N.Y., Inc.*, 580 F.2d 1122, 1127–31 (2d Cir. 1978). Under that doctrine:

> A person who has performed the duty of another by supplying things or services, although acting without the other's knowledge or consent, is entitled to restitution from the other if
>
> (a) he acted unofficiously and with intent to charge therefor, and
>
> (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety.

RESTATEMENT (FIRST) OF RESTITUTION § 115. "Historically, this rule has had various applications, including burial of the dead and removing an obstruction from or making repairs upon a public road, which had become imminently dangerous to members of the traveling public." *Judge Rotenberg Educ. Ctr. Inc. v. Blass*, 882 F. Supp. 2d 371, 382 (E.D.N.Y. 2012); *see also* RESTATEMENT (FIRST) OF RESTITUTION § 115, cmnt. b (same). The City argues that the public utility rule placed Amtrak under a duty to remove its electrical equipment from the bridge, that the City paid Amtrak to do so with the intent to recoup that payment, and that the removal of

the electrical equipment was immediately necessary to preserve the public safety.

### a. Duty

Amtrak disputes that it had any duty to remove its electrical equipment from the bridge. It argues that the public utility rule did not apply because the electrical equipment was located on Amtrak's own and not the City's property. Amtrak's theory is that the equipment occupied Amtrak's airspace and merely abutted the City's bridge. But that is not so: the equipment was attached to the bridge, as Amtrak concedes elsewhere. The court therefore moves on to the question of whether the removal of that equipment was immediately necessary.

### b. Immediate Necessity

Amtrak next argues that the rehabilitation of the bridge (and the concomitant removal of Amtrak's equipment) was not immediately necessary to preserve the public safety. Amtrak points to the fact that the rehabilitation was long planned, and that the bridge was never closed to traffic, as it would have been if the state or city had deemed it to be unsafe. The City replies that the bridge has continued to deteriorate and would eventually need to be closed, and that the bridge is essential to its provision of fire, police, and emergency services to City Island, because it is one of only two bridges serving that island, and the other is a drawbridge prone to failure.

"Cases applying § 115 illustrate that the nature of the danger must be acute and severe, not merely serious or problematic." *Chase Manhattan Bank, N.A. v. T & N plc*, 1996 WL 603934, at *9 (S.D.N.Y. Oct. 22, 1996), *aff'd* 1998 WL 634218, at *3 (2d Cir. Mar. 13, 1998). "The rule . . . is not applicable unless there is an immediate necessity for action . . . ." RESTATEMENT (FIRST) OF RESTITUTION § 115, cmnt. a. In a true emergency, "it is desirable to encourage persons to interfere with the affairs of others." *Id.* § 112, cmnt. b (discussing the general rule regarding benefits voluntarily conferred). At most other times, it is not. Whether a danger is sufficiently acute and severe to come within the scope of the emergency assistance

doctrine is sometimes a contested question of fact.  *See, e.g.*, *Chase Manhattan*, 905 F. Supp. at

123 (finding that whether asbestos remediation was "immediately necessary is a question of fact

very much disputed by the parties" and collecting cases in which the issue of immediate

necessity precluded summary judgment); *Nat'l Railroad Passenger Corp. v. New York City*

*Housing Auth.*, 819 F. Supp. 1271, 1280 (S.D.N.Y. 1993) ("[T]he question of whether the

removal was immediately necessary to protect the public is one fact which precludes summary

judgment at this point.").  But here, it is obvious that the City had ample time to seek a

declaratory judgment that Amtrak was obligated to remove its electrical equipment from the

bridge.  The City began planning for the rehabilitation in 1997 and signed its first agreement

with Amtrak in 2003.  The electrical equipment was not removed until several years later.

Because the City could have sought a judicial declaration of rights and obligations without

substantially delaying its rehabilitation project, it should have done so: in these circumstances,

no reasonable jury could find that the danger presented by the ongoing bridge decay was

sufficiently acute and severe to justify recovery under the emergency assistance doctrine.  *See,*

*e.g.*, *Chase Manhattan Bank*, 1996 WL 603934, at *10 (finding that asbestos abatement program

was not "immediately necessary" under § 115 where plaintiff was "aware of the hazard . . . for

many years," and concluding that the plaintiff's "own delay" was, among other factors, "fatal to

its claim for restitution" (citing *Corp. of Mercer Univ. v . Nat'l Gypsum Co.*, 1986 WL 12447, at

*8 (M.D. Ga. Mar. 9, 1986) (no "immediate necessity" where plaintiff delayed over a year))).

### iv.  Indemnification

The City also argues that it can recover from Amtrak under a theory of indemnification.

New York law recognizes "that '[a] person who, in whole or in part, has discharged a duty *which*

*is owed by him* but which as between himself and another should have been discharged by the

other, is entitled to indemnity.'" *McDermott v. City of New York*, 406 N.E.2d 460, 462 (N.Y.

1980) (quoting RESTATEMENT (FIRST) OF RESTITUTION § 76) (emphasis added). "In indemnity . . . a party held legally liable to plaintiff shifts the entire loss to another." *Mas v. Two Bridges Assocs.*, 554 N.E.2d 1257, 1262 (N.Y. 1990).

As Amtrak points out, indemnification is a poor fit for the facts of this case. The City does not concede that the City itself owed a duty to remove Amtrak's electrical facilities from the Shore Road Circle Bridge and then go on to claim that Amtrak also owed that duty and should have performed it, as would occur in an indemnification case. *Cf. McDermott*, 406 N.E.2d at 462; *see also Chase Manhattan*, 905 F. Supp. at 124 ("[A] claim for indemnity under § 76 requires . . . that the party seeking indemnity have an independent duty to discharge."). Instead, the City's theory is that Amtrak *and not the City* was responsible for that work. Nor has the City been found legally liable for the cost of removing the electrical equipment. *Cf. Mas*, 554 N.E.2d at 1262; *see also Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 307 (S.D.N.Y. 2010) (Indemnification "is grounded in the 'principle that "every one is responsible for the consequences of his own negligence, and if another person has been compelled . . . to pay the damages which ought to have been paid by the wrongdoer, they may be recovered from him."'" (quoting *Raquet v. Braun*, 90 N.Y.2d 177, 183 (N.Y. 1997) (quoting *Oceanic Steam Nav. Co. v. Compania Transatlantica Espanola*, 134 N.Y. 461, 468 (1892))) (alteration in original).

The City cites *City of New York v. Lead Industries Association, Inc.*, 222 A.D.2d 119 (N.Y. App. 1996), in which the Appellate Division of the New York Supreme Court said that "[a]n implied indemnity action is based upon the law's notion of what is fair and proper between the parties and its purpose is equitable distribution of the loss." *Id.* at 128. Despite the breadth of that statement, the facts of the case fit comfortably within the indemnification action as the New York Court of Appeals has defined it. *Lead Industries* concerned a number of City-owned

buildings in which lead paint had been applied.  The City, as owner of the buildings, owed its tenants a duty to abate the hazard—and the paint manufacturer allegedly owed those same tenants damages for exposing them to an unreasonably dangerous product which (it was alleged) the manufacturer had fraudulently misrepresented.  *Id.* at 122.  As the court explained, "[t]he gravamen of an action for indemnity is that both parties, indemnitor and indemnitee, are subject to a duty to a third person under such circumstances that one of them, as between themselves, should perform it rather than the other."  *Id.* at 125.  The City's theory was that both it and the paint manufacturer had a duty to the tenants arising from the introduction of lead-based paint into their living residences, and so it would pay to remove the hazard and then sue the manufacturer for indemnification.

Here, by contrast, the City alleges that Amtrak owed the City a duty to remove its electrical equipment from the bridge (which the City owned) and that the City owed the public a duty to keep the bridge in good repair.  The City does not argue that, in paying for the removal of the electrical equipment, the City was performing its duty, but rather that it was performing Amtrak's duty to it.  That does not amount to a claim for indemnification, and so the court will grant summary judgment to Amtrak.

## IV.  CONCLUSION

For the reasons discussed above, the court will grant summary judgment to Amtrak on all claims.

Rudolph Contreras
United States District Judge

Issued: July 25, 2013
Amended: August 13, 2013